[No. A086725. First Dist., Div. Four. Aug. 16, 2000.]

DAVID DeZEREGA et al., Plaintiffs and Appellants, v.
JASON MEGGS, Defendant and Respondent.

## COUNSEL

Malcolm A. Smith for Plaintiff and Appellants.

David J. Beauvais for Defendant and Respondent.

Marjorie Gelb, Brian Kelly and Donald A. Tine for City of Berkeley Rent Stabilization Board as Amicus Curiae on behalf of Defendant and Respondent.

## OPINION

**SEPULVEDA, J.**—We ordered transfer of this appeal from a judgment of the Alameda County Municipal Court after it was certified for such transfer by the Appellate Division of the Alameda County Superior Court. (Cal. Rules of Court, rules 61-69.) It concerns the right of a "roommate," whose occupancy in a leased apartment was approved and expressly authorized by the owner, to the protections of the eviction-control provisions adopted by the City of Berkeley and in effect when the owners sought to evict the "roommate." We conclude that, contrary to the determination of the appellate division, the trial court correctly held the "roommate" entitled to those protections as a matter of law, such that the "roommate" was entitled to

summary judgment in view of the landlords' failure to serve a notice stating good cause for termination of the roommate's occupancy. We further conclude that we lack jurisdiction over the landlords' appellate challenge to an award of attorneys' fees. Accordingly, we affirm the judgment from which the appeal is taken, and dismiss the appeal from the fee award.

## BACKGROUND

Plaintiffs David and Sara DeZerega are owners of an apartment building on Piedmont Avenue in Berkeley, which includes the three-bedroom unit at issue in this lawsuit (hereafter the premises). In late December of 1995, Sara DeZerega executed an agreement to lease the premises to Helen Yoon, who was identified in the lease as "Tenants" or "Tenant(s)." The lease, which was largely typewritten or computer-generated, provided that the premises were "to be used only as a private residence by, and occupancy is limited to, the following named persons: Helen Yoon and Two roommates." It went on to provide that "[a]ny unregistered occupant or occupancy by any person disallowed by Owner shall void this agreement and possession of the premises shall revert to Owner." It flatly prohibited any assignment or subletting.

In February 1997, defendant Jason Meggs[1] met with Helen Yoon and the two other then occupants, Michael Nnadi-Nwazurumike and Aaron Forth, and arranged to move in, apparently in place of Forth. Defendant later declared that he and the other occupants agreed to "share the common areas including the living room, bathroom and kitchen" and to "share equally the household expenses including rent." Forth moved out, and on March 1, 1997, defendant moved in. He paid his share of the March rent to Yoon, and assumed a share of the security deposit by reimbursing Forth for the share he had previously paid.

Around this time, Helen Yoon delivered to defendant a blank "Application to Rent" form sent to her by plaintiff Sara DeZerega, "to have the new roommate fill out." The form bore a typewritten mailing address for "D. DeZerega" and the legend, "Individual applications required from each adult occupant." It also recited that "[t]he undersigned makes application to rent housing accommodations" at the address of the premises. It requested information about the applicant's present address, employment, reasons for moving, references, and emergency contacts. Sara DeZerega later declared, however, that she never ran a credit or reference check on defendant.

---

[1]Although Michael Nnadi-Nwazurumike is also a defendant in this matter, he has not appeared on this appeal. Therefore, except where otherwise indicated, we use the term "defendant" solely to refer to respondent Jason Meggs.

On March 3, defendant mailed the form, filled in with the requested information, to plaintiff Sara DeZerega.[2] He included a cover letter in which he wrote that he was "very happy to be living in one of your units," and "hope[d] to stay for some time."

Coincidentally, on March 3 Helen Yoon called Sara DeZerega to say that she wished to end her own occupancy of the premises and "wanted to know about the logistics in transferring the lease to Michael Nnadi-Nwazurumike." Ultimately Nnadi-Nwazurumike submitted an application to rent, including a credit application and processing fee. On or about March 18, 1997, he and Sara DeZerega executed a lease as "tenant(s)" and "owner," respectively. It was substantially similar, if not identical, to the lease executed by Helen Yoon. It recited that "tenant(s)" rented the described premises for residential purposes "on a month-to-month basis, terminable by Owner or Tenant(s) by the giving of 30 days written notice to the other (MONTH TO MONTH RENTAL)." Paragraph 9, entitled "USE AND OCCUPANCY," provided, "The premises are to be used only as a private residence by, and occupancy is limited to, the following named persons," followed by a blank space in which was written "Michael Nnadi-Nwazurumike and 2 (two) roommates." It went on to state, "The 'base occupancy level' of the premises is 3 person(s). Tenant(s) agrees not to allow any other person to occupy said premises without written approval of Owner." Paragraph 12, entitled "ASSIGNMENT AND SUBLETTING," flatly prohibited (1) assignment or subletting of "Tenant(s)' " interest; (2) advertising the premises for renting; (3) placing "[a]ny name, other than those of the Tenant(s)" on the mailbox serving the premises; and (4) listing any telephone service for the premises in a name "other than those of Tenant(s)." Paragraph 20 provided that in the event of proceedings "to enforce any part of this agreement," the prevailing party would recover reasonable attorneys' fees and costs.

On April 22, plaintiffs apparently issued a "Vacancy Registration" under the local rent ordinance stating that the tenancy of Helen Yoon ended, and that of Michael Nnadi-Nwazurumike began, on April 8, 1997. At some point Yoon was apparently replaced by a new "roommate," Karla Stine.

On September 30, 1997, Michael Nnadi-Nwazurumike served defendant with a handwritten 30-day notice to vacate. The notice stated, "This is your official 30 day notice of eviction. This means that by no later than October 31, 1997 you need to have all of your possessions removed from 2522 Piedmont Ave. #7 in Berkeley. I also expect the return of all keys to the premises. You will receive your deposit of $705 back if you clean and repair

---

[2]Plaintiffs emphasize that defendant did not sign the form. Like the trial court, we are unable to discern any legal significance in this fact.

any damage you may have inadvertently caused while in residence. As of the evening of 9/30/97, you have not paid your share of October 97 rent. I will assume you want the landlord, Sara DeZerega, to deduct your last month (October) rent of $353 from your $705 deposit. [¶] If you have any questions please feel free to ask me or you can contact Sara DeZerega. [¶] Sincerely, M.A. Nnadi-Nwazurumike [¶] the sole lessee of 2522 Piedmont #7 [¶] Berkeley, CA 94704."

In October 1997 defendant offered to pay his share of the rent directly to Sara DeZerega. She declined, writing on October 31 that she was returning his check, and recapitulating a previous conversation in which she told him that "our policy is not to accept checks directly from roommates of the person who has signed the rental agreement with us, in this case Michael Nadi-Nwazurumike [*sic*]. Michael is solely responsible for all the rent and we will accept a check only from him. [¶] Any arrangements, monetary or otherwise, that you have with Michael are strictly between the two of you."

On or around November 17, 1997, Michael Nnadi-Nwazurumike wrote to Sara DeZerega "to give my official 30 day notice to vacate your apartment . . . by midnight of December 17, 1997." He went on to write, "I will notify Jason Meggs and Karla Stine that I am moving and that they should either be out by 12/17/97 or contact you about other arrangements. I know that Karla may be interested in continuing to stay on in the apartment, but I do not know how that will work out with the Jason Meggs situation. [¶] I had indicated that I would pursue eviction procedures against Jason Meggs, but the amount of energy and time required to do this is too great for me at this time. I appreciate your understanding over the last few months. I also hope that you have better luck dealing with Mr. Meggs."

On November 17, 1997, Nnadi-Nwazurumike wrote to defendant and Karla Stine, stating in part, "I am officially letting you know that I have already given the owner of the apartment, Sara DeZerega, 30 days notice that I am ending my lease and vacating the apartment. By 12 midnight, December 17, 1997, we will all need to have our things out of the apartment as well as clean the premises so that we can recover as much of our deposits as possible. Since the lease has always been in *only* my name it is required that we all move out by the above time unless the owner would like to make other arrangements with you both."

On December 4, 1997, David and Sara DeZerega wrote to defendant again declining to accept a check from him and adding, "As I explained in a previous letter, Michael A. Nnadi-Nwazurumike is the only person with whom we have a signed rental agreement and he is solely responsible for the

rent until December 17, 1997. Likewise he will be the recipient of the deposit when the apartment is vacated. Any monies owed to you by him or vice versa is [*sic*] a matter between the two of you. As explained to us by our attorney and according to the rent board publication on sub-letting, Michael A. Nnadi-Nwazurumike is our tenant. You are Michael's roommate and as such are considered a 'sub-tenant.' For legal purposes Michael is your landlord. When Michael gives us a 30 day notice of intent to vacate, (as he has done) the rental agreement ends. Michael and all of his roommates (sub-tenants) need to leave with him, by midnight December 17, 1997. Anyone occupying the premises after that time is trespassing and is subject to legal action. [¶] Once a written 30 day notice has been given to us, we are free to sign a rental agreement with someone else. Present roommates have no standing as tenants or entitlement to the unit. Our policy and procedure always has been for such persons to complete an application and undergo screening. We may or may not choose a former roommate as the new tenant. As a practical matter, you may apply, but it is unlikely that we would choose you for several reasons: a. we need the unit vacant 1-2 weeks to do some much overdue work; b. landlord and personal references are considered and Mr. Nnadi-Nwazurumike is unlikely to give you a positive reference; and c. there are others on a waiting list. It would be in your best interests to look for another place to live."

Defendant remained in the premises, and on December 23, 1997, plaintiffs initiated the present action by filing a complaint in unlawful detainer against defendant and Michael Nnadi-Nwazurumike. Plaintiffs alleged that they had leased the premises to Nnadi-Nwazurumike under a written lease, a copy of which was attached; that defendants other than Nnadi-Nwazurumike (i.e., defendant) were subtenants; and that "the tenant herein" had terminated the tenancy by serving a written notice, a copy of which was attached, which was "accepted in writing by the landlord," terminating the tenancy on December 17, 1997. Alleging that "[a] written agreement between the parties provides for attorney fees," plaintiffs prayed for costs including attorneys' fees, plus damages for holding over.

Defendant and Nnadi-Nwazurumike separately answered the complaint with general denials. In addition, defendant asserted that the complaint "fail[ed] to state a cause of action for unlawful detainer," that he did not give notice of termination of his tenancy, that plaintiffs lacked good cause for his eviction under the local rent control ordinance, that he had resided on the premises at all times "with the full knowledge, acquiescence, permission or approval of plaintiffs," and that plaintiffs had been charging rent in excess of the lawful rent ceiling.

On February 10, 1998, defendant filed a motion for summary judgment. The gist of his argument in support of the motion was that he was not a

subtenant, as claimed by plaintiffs, but a tenant; and that even if he was a subtenant, he was protected against eviction by the Berkeley rent control ordinance. Plaintiffs opposed the motion, and eventually filed their own cross-motion, contending that defendant was a subtenant of Yoon, and that when Nnadi-Nwazurumike succeeded to Yoon's interest as master lessee, defendant "attorned" to Nnadi-Nwazurumike by paying him rent. They further contended that the rent ordinance was inapplicable because Nnadi-Nwazurumike, as landlord, shared kitchen and bath facilities with defendant, as tenant, thereby placing the tenancy within an express exception to the eviction-control portions of the ordinance.

On June 22, 1998, the trial court issued an 11-page memorandum denying plaintiffs' motion for summary judgment and granting defendant's. The court concluded that defendant was plaintiffs' own tenant, not a subtenant, and that even if he was a subtenant he occupied the premises with plaintiffs' consent and was therefore entitled under the local ordinance to continued occupancy in the absence of good cause for eviction. On July 29, 1998, the court entered a judgment by which plaintiffs took nothing and defendant recovered costs.

On August 10, 1998, plaintiffs filed a timely notice of appeal from the "Judgment entered against them on July 29, 1998." (See Cal. Rules of Court, rule 122(a).) Defendant thereafter filed a memorandum of costs seeking court fees and $11,783 (ultimately amended to $12,240) in attorneys' fees. Defendant also filed a motion to fix attorneys' fees, asserting that he was "the prevailing party in an action on contract which provides for the fees to the prevailing party." Plaintiffs contested defendant's entitlement. The trial court awarded fees in the amount requested and entered an amended judgment so reflecting.[3] No separate appeal was taken from the amended judgment.

On February 25, 1999, a divided panel of the appellate division reversed the judgment, without opinion, and directed the trial court to enter judgment for plaintiffs. The court subsequently granted defendant's motion to certify the matter for transfer to this court. We granted transfer on May 6, 1999.

---

[3]The court's formal order awarded fees only in the amount of $11,600, but both the minute order and the amended judgment set forth an amount of $12,240, and the explanatory provisions of the minute order make it clear that this was the court's intention.

DISCUSSION

I.

*Plaintiffs' Motion Was Properly Denied.*

■ Plaintiffs' motion for summary judgment rested on the premise that defendant was not a tenant of plaintiffs but occupied the premises only as a subtenant of Nnadi-Nwazurumike. Plaintiffs thus contended that defendant became a trespasser when Nnadi-Nwazurumike voluntarily terminated his tenancy, and that defendant could thereafter be lawfully evicted without notice and without compliance with the Berkeley eviction ordinance.

To establish an entitlement to summary judgment, of course, plaintiffs had to show not only that these premises were sound but they were established in plaintiffs' favor free of any triable issues of fact, i.e., as a matter of law. Plaintiffs did not carry this burden. The evidence before the trial court fell far short of demonstrating as a matter of law that defendant was a subtenant of Nnadi-Nwazurumike rather than a tenant of plaintiffs.

Nowhere in their brief, nor anywhere in the record that we can see, do plaintiffs attempt to marshal the facts supposedly establishing as a matter of law that defendant was a subtenant of Nnadi-Nwazurumike. A scan of the record discloses ample evidence supporting the opposite conclusion and raising a triable issue of fact, if not a contrary determination as a matter of law. Perhaps most tellingly, the lease defining the estate of Nnadi-Nwazurumike, the putative sublessor, *flatly prohibited subletting.* The claim that defendant was a subtenant not only contradicts this ban but creates an internal conflict between the ban and the express authorization of two "roommates." Plaintiffs have made no attempt to reconcile or otherwise explain this conflict, even though the trial court emphasized this point in its own analysis.[4] Of course the most obvious way to reconcile these two clauses is to view "roommates" as tenants.

---

[4]After noting that "[t]he agreement prohibits assignments and subleases and contains an integration clause," the court quoted the prohibition in a footnote. It then wrote, "Although given considerable weight in this decision, this prohibition against assigning and subleasing was not briefed or argued by counsel." Despite two subsequent opportunities—first in the appellate division, then here—plaintiffs have steadfastly ignored this provision. Their brief in the appellate division simply went without explanation from referring to defendant as a "roommate" to characterizing his estate as a "subtenancy."

Furthermore, the flat ban on subtenancies and the pervasive use of "Tenant(s)" seemingly to describe all authorized occupants[5] could readily engender a belief and understanding by "roommates" who saw the lease that they were in fact tenants of plaintiffs. We are directed to nothing that would have put defendant on notice, prior to the dawning of the present dispute, that plaintiffs considered him a "subtenant" of Yoon or Nnadi-Nwazurumike. A review of the lease would have told him only that his occupancy was expressly authorized and that there were, and could be, no subtenants on the premises.

Nor does the evidence convincingly establish that Nnadi-Nwazurumike viewed himself as defendant's lessor. In his September 30 notice to defendant to vacate the premises he described himself as the "sole lessee," but indicated that he viewed plaintiffs—not himself—as responsible for future handling of defendant's security deposit: "You will receive your deposit of $705 back if you clean and repair any damage you may have inadvertently caused while in residence. As of the evening of 9/30/97, you have not paid your share of October 97 rent. I will assume you want the landlord, Sara DeZerega, to deduct your last month (October) rent of $353 from your $705 deposit." He went on to invite defendant to bring any questions to him "or you can contact Sara DeZerega." In his letter to plaintiffs of November 17, 1997, he seemed to disclaim any legal obligation to secure possession from defendant, writing, "I had indicated that I would pursue eviction procedures against Jason Meggs, but the amount of energy and time required to do this is too great for me at this time. I appreciate your understanding over the last few months. I also hope that you have better luck dealing with Mr. Meggs." Again, these are not the words of one who understands himself as a master lessee and sublessor, to whom any holding over by a subtenant is attributed, and to whom the master lessor may look for any resulting damages. These sound more like the words of one who has been *told* that he bears some ill-defined responsibility with respect to "roommates," but whose understanding of and belief in that proposition are far from complete.

The trial court acted properly insofar as it denied plaintiffs' motion for summary judgment. The evidence was *at least* sufficient to raise a triable

[5]The lease imposes various restraints on "Tenant(s)," but none on "roommates." Thus the prohibition on subletting, by its terms, binds only "Tenant(s)." The lease similarly bars "Tenant(s)" from advertising the property as available for rent, permitting strangers to occupy the premises without the landlord's consent, and making alterations and repairs to the premises. It also requires "Tenant(s)" to keep the premises in good repair, and obligates them to reimburse the landlord only for "damage caused by Tenant(s) or their guests or invitees." A "roommate," as commonly conceived, cannot be viewed as a guest or invitee. (See *Rowland v. Christian* (1968) 69 Cal.2d 108, 113-114 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496] [defining "guest" and "licensee"].)

issue of fact with respect to defendant's status as tenant or subtenant, as those terms are used at common law.

## II.

### *Defendant's Motion Was Properly Granted.*

A more difficult question arises from the trial court's granting of defendant's motion for summary judgment. As we read the court's thorough and careful opinion, its ruling rested on two independent grounds. First it concluded in essence that the dealings between and among plaintiffs, the named lessees, and defendant were such as to make defendant a tenant of plaintiffs, rather than a subtenant of the named lessees and a stranger to plaintiffs' estate. Second, the court concluded that even if defendant were viewed as a subtenant under common law, he was entitled to the protections against eviction without cause set forth in the Berkeley Rent Stabilization and Eviction for Good Cause Ordinance No. 5467-N.S., as amended (hereafter the Ordinance). ▆ Although we are uncertain that the first ground is established by this record as a matter of law—as it would have to be to justify summary judgment—we have concluded that the second ground is conclusively established by the evidence of record, such that defendant was entitled to summary judgment.

Plaintiffs have never claimed that they had grounds to evict defendant in compliance with the Ordinance. With enumerated exceptions, none of which is contended to apply here,[6] its eviction-control provisions apply to "all real property which is being rented or is available for rent for residential use in whole or in part." (Ord., § 13.76.050.) As potentially relevant here it provides, "[n]o landlord shall be entitled to recover possession of a rental unit covered by the terms of this chapter unless said landlord shows the existence" of one of 11 grounds for eviction. (Ord., § 13.76.130, subd A.) Failure to specify one of these grounds in a notice of termination or notice to quit, or in an unlawful detainer complaint, is a defense to any action to recover possession. (Ord., § 13.76.130, subd. B.)

All but one of the enumerated grounds for eviction use the term "tenant" to describe the person from whom possession is sought. (E.g., Ord., § 13.76.130, subds. A.1. ["tenant has failed to pay rent . . ."], A.2. ["tenant has continued . . . to substantially violate any of the material terms of the

---

[6]That is, it is not suggested that any of the exceptions would apply to the relationship, if any, between plaintiffs and defendant. Plaintiffs do contend that one or more exceptions would apply if the named lessee, Michael Nnadi-Nwazurumike, were viewed as defendant's landlord. As we conclude, however, defendant was plaintiffs' "tenant," for purposes of the Ordinance, as a matter of law.

rental agreement . . ."], A.3. ["tenant has wilfully caused or allowed substantial damage to the premises . . ."], A.5. ["tenant has continued, following written notice to cease, to be so disorderly as to destroy the peace and quiet of other tenants or occupants . . . or the tenant is otherwise subject to eviction pursuant to subdivision 4 of Code of Civil Procedure Section 1161"], A.7a. [landlord lawfully undertakes repairs which "cannot be completed while the tenant resides on the premises"].) We therefore join the parties in assuming that the applicability of the eviction-control provisions depends on whether the person from whom possession is sought is a "tenant" under the Ordinance. "Tenant" is defined as "any *renter*, tenant, *subtenant*, lessee, or *sublessee* of a rental unit, or *successor to a renter's interest*, or any group of tenants, subtenants, lessees, or sublessees of any rental unit, or *any other person entitled to the use or occupancy of such rental unit.*" (Ord., § 13.76.040, subd. I, italics added.)

The trial court accepted defendant's contention that even if he was a "subtenant" under the common law he meets the above definition of "tenant" and can therefore be evicted only as provided in the Ordinance. Plaintiffs offer no coherent response to this contention. The Ordinance expressly includes not only "subtenants" and "sublessees" but three other categories of equal or greater breadth: "renter," "successor to a renter's interest," and "any other person entitled to the use or occupancy of such rental unit." (Ord., § 13.76.040, subd. I.) In combination these terms indicate that any person who acquires a legal right to occupy the premises thereby becomes a "tenant" under the ordinance.

Plaintiffs contend that defendant was not a "person entitled to the use or occupancy" of the premises because his estate as subtenant was extinguished by the termination of the sublessor's estate. Assuming this would be true at common law, the Ordinance was manifestly intended to extend its protections beyond common law doctrines to include "renter[s]" and "successor[s] to a renter's interest." It follows that the operative question is not whether the occupant had a common law right to possession when the landlord brought a suit for eviction, but whether the occupant had at some prior time acquired a legitimate right to possession as a "renter," "successor," "subtenant," "sublessee," or otherwise. If the answer is affirmative, then the ordinance requires the landlord to comply with its eviction procedures.

This same analysis answers plaintiffs' contention that the Ordinance "does not purport to limit the power of a tenant to voluntarily terminate a tenancy." This statement depends, for whatever persuasive force it might have, on a glaring ambiguity as to the identity of the "tenant" being discussed. Of course the Ordinance does not imprison tenants in premises they wish to

leave. It was adopted against the background of a severely constricted rental market in which it was reasonable to suppose that a tenant's departure would ordinarily inflict little if any injury upon the landlord, who could immediately find a replacement. The relevant purpose of the Ordinance was thus to "protect tenants from . . . arbitrary, discriminatory, or retaliatory evictions." (Ord., § 13.76.030.) Obviously, then, plaintiffs are correct in asserting that the Ordinance does not affect a tenant's power to terminate his or her *own* tenancy. But that point is irrelevant here, because Nnadi-Nwazurumike's power to terminate his *own* tenancy was never in issue. The question is whether his action in doing so ipso facto deprived *defendant* of his right to possession, or to state the reciprocal question, whether it empowered plaintiffs to evict defendant without cause. By extending eviction protections to subtenants and other occupants who lawfully acquire a possessory interest in rented premises, the Ordinance *does* effectively limit a sublessor's power to terminate that interest, or more precisely, the landlord's power to rely on such a putative termination to recover possession from the subtenant.

Plaintiffs do not coherently contend that the ordinance is preempted by state law or is otherwise invalid insofar as it protects subtenants and others who may not be "tenants" at common law. In an argument of extremely remote pertinence they cite the Costa-Hawkins Rental Housing Act, Civil Code section 1954.50 et seq. (hereafter the Act), for its recognition, preservation, and arguable expansion of a landlord's power to refuse consent to assignment or subletting. (See Civ. Code, § 1954.53, subd. (d)(4).)[7] However there can be no issue here of plaintiffs' consent to any subletting by defendant. They expressly consented to his occupancy in the underlying lease. This renders the cited provision irrelevant. Indeed the only apparent pertinence of the Act is its implied acknowledgment and ratification of the limitations imposed by some local ordinances on the eviction of persons who, like defendant, may not be "tenants" in the common law sense, but who entered the premises with the landlord's consent and thereby acquired a right or claim to continued occupancy.

The Act explicitly disclaims any effect on the power of local governments to regulate evictions. (Civ. Code, § 1954.52, subd. (c) ["Nothing in this section shall be construed to affect any authority of a public entity that may otherwise exist to regulate or monitor the basis for eviction."]; *id.*, § 1954.53, subd. (e) [same].) Its overall effect is to preempt local rent control ordinances in two respects. First it permits owners of certain types of

---

[7]The statute was amended in 1999. (Civ. Code, § 1954.53, as amended by Stats. 1999, ch. 590, § 2.) However the only effect of the amendments on the provisions cited here was to add numbering to some subparagraphs. For convenience of reference, we cite the statute as amended.

property to adjust the rent on such property at will, "[n]otwithstanding any other provision of law." (Civ. Code, § 1954.52, subd. (a).) Second it adopts a statewide system of what is known among landlord-tenant specialists as "vacancy decontrol," declaring that "[n]otwithstanding any other provision of law," all residential landlords may, except in specified situations, "establish the initial rental rate for a dwelling or unit." (Civ. Code, § 1954.53, subd. (a).)

The Act's treatment of subtenants who remain in possession after the departure of their sublessor is entirely consistent with the Ordinance's inclusion of such persons in its eviction-control provisions. Thus Civil Code section 1954.53, subdivision (b), though seriously muddled, seems intended to express the idea that the rent level established upon an "initial hiring" applies to a "tenant, lessee, *authorized subtenant*, or *authorized sublessee* for the entire period of his or her occupancy . . . ."[8] (Italics added.) Subdivision (d)(2) of the same section provides that the landlord may raise rents when the "occupant or occupants who took possession of the dwelling or unit pursuant to the rental agreement with the owner no longer permanently reside there." Subdivision (d)(3) apparently states the corollary of this when it declares in effect that a vacancy is *not* deemed to occur by virtue of "partial changes in occupancy of a dwelling or unit where one or more of the *occupants of the premises, pursuant to the agreement with the owner* . . . remains an occupant in lawful possession." (Italics added.)

Taken together these provisions compel the conclusion that an occupancy by a subtenant, "roommate," or other person occupying the premises "pursuant to the rental agreement with the owner" is treated as a continuation of the original occupancy, even though the named "tenant" under the rental agreement may have vacated. Plaintiffs simply ignore these provisions in favor of a clause stating that the original occupancy is also deemed to continue where a "lawful sublessee or assignee who resided at the dwelling or unit prior to January 1, 1996, remains in possession of the dwelling or unit." (Civ. Code, § 1954.53, subd. (d)(3).)

In sum, the Act has no direct bearing on the present action, and insofar as it has any indirect bearing it is entirely consistent with application of the Berkeley eviction control provisions according to their terms, i.e., to subtenants who lawfully enter into possession of the premises, at least where—as here—they do so with the landlord's express consent and, indeed, under the explicit authority of the underlying lease.

We emphasize, however, the narrowness of our holding. We do not decide whether a landlord may be barred from evicting a subtenant, or other

---

[8]The Act is something less than a model of excellence in legislative drafting.

occupant, who has occupied the premises without the landlord's agreement or knowledge and who seeks to remain on the premises after the departure of all persons to whose occupancy the landlord has consented. We hold only that where a landlord agrees to an occupancy, characterization of the occupancy as a subtenancy does not prevent application of the Ordinance's requirement of cause for eviction. Here the landlords expressly authorized, approved, and agreed to the very occupancy they now seek to terminate without cause. We hold only that they may not do so consistent with the terms of the Ordinance.[9]

Finally, we briefly address plaintiffs' contention that defendant's position must be rejected because he asserts a claim to the entire apartment and not just the one-third he occupied as a "roommate." Plaintiffs assert that defendant cannot assume a right to occupy the entire estate merely because his co-occupants have left. This argument, even if meritorious in some context, is insufficient to impeach the trial court's entry of summary judgment. If it is correct, it means only that plaintiffs are entitled to rent the remaining two-thirds of the apartment to others. By no known logic can it lead to a conclusion that plaintiffs are entitled to evict defendant.

In view of our affirmance on other grounds we need not address defendant's argument that he necessarily became a "tenant" by remaining in

---

[9]In an acerbic if not intemperate petition for rehearing, counsel for plaintiffs accuses the court (directly or by pointed implication) of: (1) ruling against plaintiffs "without considering" their contention that defendant had no contractual relationship with them; (2) not "bothering to cite any case law"; (3) deciding the case "without, apparently, the benefit of consulting the common law"; (4) rendering "a mere expression of personal opinion, [which] does not constitute a reasoned decision illuminated and informed by precedent [and which] is fundamentally political, rather than legal, in nature"; (5) failing "to review and consider legal precedent"; (6) "ignor[ing]" statutory language cited by plaintiffs (i.e., Civ. Code, § 1954.53, subd. (d)); and (7) "rul[ing] against the plaintiffs without hearing their arguments, and [doing] so in a decision that cites virtually no law." Counsel asserts, "The plaintiffs, as citizens of this state and as taxpayers in this state who pay for judicial salaries, deserve better."

Our opinion directly reflects the manner in which the case was presented to us. We emphasize again that plaintiffs' key contention—that defendant was a "subtenant"—is contradicted by the express language of plaintiffs' own lease. Plaintiffs took themselves outside the black-letter common law—or at least, outside the doctrines they have invoked here—by explicitly authorizing defendant's occupancy while flatly prohibiting subleasing. In any event it needs no citation or extended discussion to establish that common law doctrines must yield to positive legislative enactments not shown to possess any constitutional infirmity. Finally, the statute we are accused of failing to consider (Civ. Code, § 1954.53, subd. (d)) scarcely warrants extended discussion because, by its plain terms, it operates only to disclaim any new *diminution* in a landlord's preexisting rights.

Counsel's vituperation aside, we remain satisfied that our analysis flows logically, and indeed inevitably, from the facts and issues as presented to us. If the result is less than plaintiffs deserve, the fault lies elsewhere than in this court.

possession after the termination of the Yoon tenancy and during the transition to the Nnadi-Nwazurumike tenancy. It is also unnecessary to determine whether defendant "attorned" to Nnadi-Nwazurumike, since that would establish at most that he was a subtenant at common law. We have held that, whatever his status, he was entitled under the circumstances to the protections of the Ordinance. It follows that the trial court acted properly in granting summary judgment in defendant's favor, because plaintiffs' claim for unlawful detainer cannot succeed.

## III.

*We Lack Jurisdiction to Review the Attorneys' Fee Award.*

Plaintiffs' final challenge to the judgment concerns the court's award of attorneys' fees. We lack jurisdiction, however, to review that award, and must therefore dismiss that portion of the appeal.

The original judgment, entered on July 29, 1998, allowed "costs of suit" but did not award attorneys' fees. The notice of appeal was filed on August 10, 1998. It stated that plaintiffs appealed from the "Judgment entered against them on July 29, 1998." Defendant first sought an adjudication with respect to attorneys' fees when, on August 13, 1998, he filed a memorandum of costs and motion for allowance of such fees. On September 9, the trial court entered an order granting the motion, and an amended judgment incorporating a fee award. No appeal was taken from the subsequent order or the amended judgment.

An order awarding attorneys' fees, if made after judgment, is separately appealable. (*Soldate v. Fidelity National Financial, Inc.* (1998) 62 Cal.App.4th 1069, 1073 [72 Cal.Rptr.2d 404]; see Code Civ. Proc., § 904.1, subd. (a)(2).) "[W]here several judgments and/or orders occurring close in time are separately appealable (e.g., judgment and order awarding attorney fees), each appealable judgment and order must be expressly specified—in either a single notice of appeal or multiple notices of appeal—in order to be reviewable on appeal." (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 1998) ¶ 3:119.1, p. 3-34 (rev. #1, 1997), italics omitted.)

This rule was held not to bar review of a fee award in *Grant v. List & Lathrop* (1992) 2 Cal.App.4th 993 [3 Cal.Rptr.2d 654], because the original judgment there declared the prevailing party entitled to fees, while leaving

the amount blank. The reviewing court held that such a judgment "subsumes" a subsequent order fixing the amount of fees, so that an appeal from the original judgment confers appellate jurisdiction over the later order. (*Id.* at p. 997.) The court emphasized, however, that the entitlement to fees had been expressly determined in the first judgment and was therefore not a purely collateral issue, separately tried. (*Ibid.*)

Here the initial judgment said nothing about fees. The entire litigation of that issue occurred after the entry of the judgment from which the appeal was taken. Accordingly the judgment cannot be said to "subsume" the later fee award. It follows that the exception adopted in *Grant* cannot be held to apply, and jurisdiction over the fee award cannot be found.

At oral argument counsel for plaintiffs suggested that the judgment effectively awarded attorneys' fees because it expressly allowed *costs* to defendants, and fees were ultimately recovered as costs under Civil Code section 1717.[10] The issue, however, is not whether fees were ultimately recovered "as costs" but whether the *entitlement* to fees was *adjudicated* by the original judgment, leaving only the issue of amount for further adjudication. The answer to this question is clearly negative. Plaintiffs' opposition to the motion for fees scarcely addressed the issue of amount, relying instead on the argument that "defendant is not entitled to attorney's fees in this matter," for the asserted reason (among others) that "[n]either party . . . sought to enforce the provisions of a contract with an attorney fee provision." In the trial court, no one treated the original judgment as having determined any entitlement to fees. The parties' conduct and the written record belie counsel's assertion at oral argument that after judgment was entered, nothing remained to be determined but the amount of the fee to be allowed. It follows that the order granting the motion for fees was the only one from which an appeal challenging the award would lie.

---

[10]Counsel presumably relied on the portions of Civil Code section 1717, subdivision (a), providing that (1) where a contract allows for attorneys' fees, the prevailing party "shall be entitled to reasonable attorney's fees in addition to other costs," and (2) "Reasonable attorney's fees shall be fixed by the court, and shall be an element of the costs of suit."

We observe that even where pure costs are concerned, an order resolving contested issues *after judgment* is separately appealable. (See *Brown v. Nolan* (1979) 98 Cal.App.3d 445, 448, fn. 2 [159 Cal.Rptr. 469] [order allocating costs among three parties]; *Jimenez v. City of Oxnard* (1982) 134 Cal.App.3d 856, 858, fn. 3 [184 Cal.Rptr. 864] [order denying motion to tax costs]; *Westerholm v. 20th Century Ins. Co.* (1976) 58 Cal.App.3d 628, 635 [130 Cal.Rptr. 164] [order granting motion to tax].) This rule does not depend on the presence or absence in the original judgment of a perfunctory (and superfluous) recital that the obviously prevailing party shall recover his or her costs. A fortiori, such a recital cannot determine the appealability of a postjudgment order determining the right to attorneys' fees.

The judgment from which the appeal was taken is affirmed. Insofar as the appeal purports to embrace the subsequent order and amended judgment awarding attorneys' fees, the appeal is dismissed.

Hanlon, P. J., and Poché, J., concurred.

A petition for a rehearing was denied September 14, 2000, and the opinion was modified to read as printed above.